IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:10-CV-00070-D

| | |
|---|---|
| GREGORY D. PAUL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the parties' cross motions for judgment on the pleadings. Claimant, Gregory D. Paul, seeks judicial review of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB"). After a thorough review of the record and consideration of the briefs submitted by counsel, it is recommended that Claimant's motion for judgment on the pleadings [DE-23] be denied and that the Commissioner's motion for judgment on the pleadings [DE-29] be granted.

## STATEMENT OF THE CASE

Claimant protectively filed an application for DIB on August 10, 2006. (R. 96-98.) He alleged disability beginning May 22, 2006 (R. 96), due to degenerative disc disease, back, neck, and right shoulder pain, depression, and obesity (R. 112). The application was denied initially (R. 46) and upon reconsideration (R. 47). Claimant then requested a hearing before an Administrative Law Judge ("ALJ") (R. 59), which took place on March 10, 2009 (R. 21-38). On April 9, 2009, the ALJ issued a decision denying Claimant's application. (R. 7-17.) The Appeals Council denied Claimant's request for review on February 16, 2010 (R. 1-3), which rendered the ALJ's decision a "final decision" for purposes of judicial review. *See Walls v. Barnhart*, 296 F.3d 287, 289 (4th Cir.

2002) (noting that when the Appeals Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal). Claimant then commenced this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

### I. The Standard of Review and Social Security Framework

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. § 405(g), is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *Walls*, 296 F.3d at 290; *see also* 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. *Walls*, 296 F.3d at 290. Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. 20 C.F.R. § 404.1520. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the ALJ determines whether the claimant has a severe impairment or combination of impairments that significantly limit him or her from performing basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe

2

impairment, at step three the ALJ determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listing"), 20 C.F.R. § 404, Subpt. P, App. 1. If the impairment meets or equals a Listing, the person is disabled *per se.*

If the impairment does not meet or equal a Listing, at step four the claimant's residual functional capacity (RFC) is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work. The Commissioner often attempts to carry its burden through the testimony of a vocational expert, who testifies as to jobs available in the economy based on the characteristics of the claimant.

In this case, Claimant alleges the following errors by the ALJ: (1) failure to properly assess Claimant's RFC; and (2) failure to obtain testimony from a vocational expert in light of Claimant's alleged nonexertional limitations.

## II.  The ALJ's Findings

The ALJ proceeded through the five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520(a). The ALJ first found that Claimant had not engaged in substantial gainful activity since May 22, 2006, the alleged onset date. (R. 12.) The ALJ next found that Claimant suffered from the severe impairments of degenerative disk of the cervical spine, chronic pain, and obesity. *Id.* However, at step three the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. § 404, Subpart P, App. 1. *Id.* Next, the ALJ determined that Claimant had the RFC to perform a full range of medium work. (R. 13-16.) At step four, the ALJ found that Claimant was

unable to perform past relevant work. (R. 16.) The ALJ finally determined that there were a significant number of jobs in the national economy that Claimant could perform. *Id.* As a result, the ALJ found that Claimant was not disabled from the alleged onset date through the date of decision. (R. 17.)

## III. The Administrative Hearing

Claimant testified to the following at the administrative hearing. (R. 25-37.) Claimant was 51 years old at the time of the hearing. (R. 25.) He completed ninth grade and can read a newspaper, but has some difficulty spelling. (R. 25-26.) Claimant worked as a mechanic for 16-17 years at Davis Lift Truck Service where he performed oil changes, tune-ups, and brake jobs, and packed cylinders on forklifts and other heavy equipment. (R. 27.) In the course of this work, he lifted anywhere from five-gallon jugs of oil to 150 pounds of cast iron. *Id.* Claimant stopped working in 2001 prior to undergoing spinal surgery. (R. 28.)

Claimant has had two spinal surgeries. His first, in 2001, replaced three discs, and his second, in 2006, replaced two discs. *Id.* A plate and four screws hold his spine together. *Id.* Claimant has constant tingling in his arms and hands and occasional numbness that causes him to drop things. *Id.* According to Claimant's doctors, there is no treatment for these symptoms. *Id.* Claimant also has constant pain in his neck and shoulders (R. 32), which prohibits him from working (R. 36). He takes OxyContin once or twice a day for pain management (R. 29), which sometimes causes blurred speech and dizziness (R. 35). He sees his doctor monthly to obtain a refill for his pain medication. (R. 35.) Claimant also takes medication for blood pressure and cholesterol and takes fish-oil pills and aspirin. *Id.*

4

On a typical day, Claimant gets up in the morning, takes a hot shower to help his mobility, and eats breakfast. *Id.* He then sits and rests his head and neck before cleaning his breakfast dishes. *Id.* Next, Claimant sits and watches television while wearing a neck brace, and occasionally gets up to let out his dog. (R. 29, 32-33.) Claimant does some chores, such as removing and hanging clothes from the dryer and sweeping the kitchen, but he can only do a section of the floor before stopping to rest. (R. 29-30.) He does not vacuum, because the pushing and pulling strains his neck and shoulders. (R. 30.) He does not cook on the stove, because lifting the cast iron skillets also strains his neck and shoulders, but he sometimes cooks on the grill. *Id.*

Claimant can lift approximately five to eighteen pounds before experiencing severe pain in his neck and shoulders, can sit for 35-40 minutes before needing to stand, and can stand for 35-40 minutes before needing to sit and rest his head against a wall. (R. 30-33.) Claimant becomes fatigued walking and has arthritis in his knees, for which he takes Advil. (R. 33-34.) He has limited mobility in his neck and has to turn his whole body to look right or left. (R. 33.) Claimant is licensed to drive (R. 26), but seldom does so due to his limited ability to turn his head (R. 33). He cannot reach high over his head, because he cannot lean his head back far enough to see, but has no problem reaching straight ahead. *Id.*

Claimant spends most of his time inside his home or in his backyard garage, which is outfitted with a high-backed chair, refrigerator, television, and bathroom. (R. 31.) He raises the garage door to look outside and occasionally walks across the yard to talk to his neighbors. *Id.* Claimant does not sleep well due to pain and takes a sleeping pill every night. (R. 32.) He sometimes sleeps in a recliner so as not to disturb his wife, and sometimes during the day he naps for short periods while watching television. *Id.* Claimant's wife handles the family finances (R. 26)

5

Case 7:10-cv-00070-D   Document 32   Filed 01/18/12   Page 5 of 14

and does the grocery shopping, because he cannot push the cart (R. 35). Claimant belongs to no community groups and rarely leaves his home. (R. 31.)

## IV. Claimant's Arguments

### A. Assessment of Claimant's RFC

Claimant contends that the ALJ erred by failing to assess Claimant's mental RFC as required by Social Security Rulings ("SSR") 85-15 and 96-8p. Specifically, Claimant contends that the ALJ's RFC assessment failed to consider the impact of Claimant's low IQ and dizziness on his ability to work. Claimant also contends that the ALJ's conclusion that Claimant can perform medium work is erroneous in light of Claimant's level of pain. The Commissioner counters that the ALJ properly assessed Claimant's RFC and that the decision is supported by substantial evidence. The undersigned agrees.

In determining Claimant's RFC, the ALJ stated that he considered all of Claimant's symptoms and the extent to which they were consistent with the objective medical and other evidence, including his testimony regarding pain, in accordance with 20 C.F.R. § 404.1529, SSR 96-3p, 96-4p, and 96-7p, as well as Fourth Circuit law, including *Hyatt v. Sullivan*, 899 F.2d 329 (4th Cir. 1990). (R. 13, 15.) Additionally, the ALJ considered opinion evidence pursuant to 20 C.F.R. § 404.1527 and SSR 96-2p, 96-5p, 96-6p and 06-03-p. (R. 13.) The ALJ then proceeded to discuss in detail Claimant's testimony at the hearing, including his complaints of pain, and his medical records. (R. 13-16.) After reviewing all of the evidence, the ALJ found that Claimant's RFC limited him to medium work (R. 16), which involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds," as set forth in 20 C.F.R. § 404.1567(c). Specifically, the ALJ concluded that Claimant had the RFC to "lift and carry up to 25

6

pounds frequently and 50 pounds occasionally, and to stand and walk for up to six hours in an eight-hour work day, and to sit for up to six hours in an eight-hour work day. (R. 13.)

### 1. Claimant's Mental Ability

Claimant first argues that the ALJ failed to consider his mental ability in the RFC assessment. Claimant submitted a school record, which indicated that he had a total IQ of 60 in October 1973. (R. 161.) Claimant's testimony at the administrative hearing was that he completed ninth grade, but dropped out of school in tenth grade. (R. 25.) He denied being in special classes, but stated that he repeated the first grade. (R. 26.) Claimant said he could read a newspaper, but had some difficulty spelling. *Id.* Claimant does not argue that he met Listing 12.05, Mental Retardation, and this Court has explained that "a low IQ alone does not prove manifestation of deficits in adaptive functioning before age 22 and thus does not satisfy the diagnostic definition of mental retardation." *Brooks v. Astrue*, No. 2:10-cv-37-D, 2011 WL 3882283, at *8 (Aug. 17, 2011). Instead, Claimant contends that his mental impairment impacted his "mentation and clarity of thought" and should have been considered in the RFC assessment. Pl.'s Mem. at 5 [DE-24].

The ALJ did not address Claimant's low IQ or discuss his mental ability. However, there is scant evidence in the record, beyond Claimant's IQ score, to support any mental impairment that would preclude Claimant from performing work. Claimant did not allege any mental impairments in his application for disability benefits, but did indicate that his physical impairments impacted his ability to concentrate. (R. 112.) Claimant now contends that, pursuant to SSR 85-15, the ALJ should have made findings regarding his ability to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. There is no medical evidence in the record to indicate

that Claimant had any such deficits, and Claimant did not testify to having any such deficits. To the contrary, Claimant's wife indicated, in a February 23, 2007 third-party functional report, that he had no attention deficit and that he followed written and spoken instructions, got along with authority figures, and handled stress and changes in routine "very well." (R. 147-48.) Furthermore, as the Commissioner noted, the IQ score is merely recorded on Claimant's school record, and the actual report is not in the administrative record. Based on the dearth of evidence in the record that Claimant had any mental impairment that would impact his ability to work, it was not error for the ALJ to have not discussed the low IQ score, and, alternatively, any error was harmless. *See Turman v. Astrue*, No. 3:09-cv-468, 2010 WL 4683918, at *7 (W.D.N.C. Nov. 10, 2010) (concluding that ALJ's failure to address claimant's alleged mental limitations in RFC assessment was not error, where there was no allegation or medical evidence of any mental limitation in the record).

With respect to Claimant's contention that his medications made him dizzy and impaired his mental clarity, the medical record does not support this contention. The ALJ acknowledged Claimant's testimony that his medications sometimes made him dizzy. (R. 13, 35.) However, Claimant's medical records repeatedly indicate that he made no complaints of having headaches or dizziness. (R. 175, 178, 281, 282, 285, 287 & 298.) While the ALJ must *consider* all evidence in the record, he need not *discuss* each piece of evidence. *White v. Astrue*, No. 2:08-cv-20-FL, 2009 WL 2135081, at *11 (E.D.N.C. July 15, 2009). The fact that the ALJ acknowledged Claimant's complaints of dizziness from his medication is evidence that he considered this in his assessment. Therefore, the ALJ did not err in failing to specifically discuss Claimant's allegations of dizziness when evaluating his RFC.

## 2. Claimant's Pain

Claimant next contends that the ALJ's RFC assessment is not consistent with the longitudinal record, because Claimant's severe pain would preclude him from performing any type of work on a regular and consistent basis. Claimant makes no citations to the record in support of this argument. Furthermore, the undersigned finds that the ALJ properly considered Claimant's subjective complaints of pain in the RFC assessment and that the medical evidence in the record supports the ALJ's RFC assessment that Claimant could perform medium work.

The ALJ considered Claimant's subjective complaints of pain and concluded that while Claimant had a medically determinable impairment that could reasonably be expected to produce the pain alleged, the evidence did not support his allegations of the intensity and persistence of such pain. (R. 15); *see Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996) (explaining two-step process for credibility assessment). The ALJ chronicled Claimant's medical history after his second spinal surgery on May 22, 2006, the alleged onset date. (R. 14.) The ALJ acknowledged Claimant's reports of pain, *id.*, and concluded that chronic pain was among Claimant's severe impairments (R. 12). The ALJ recognized that, particularly in the months following Claimant's May 22, 2006 surgery, Claimant had "persistent neck and arm pain." (R. 14.) Despite these findings favorable to Claimant, the ALJ's further analysis indicated that Claimant's condition thereafter improved.

The ALJ noted that by February 7, 2007, less than 12 months after the alleged onset date, Claimant reported that although he still had pain, it was "a lot better," that he was doing "fairly well" as long as he was taking his medicine, that he was more mobile and walking approximately one and a half miles per day, and that he was sleeping better. (R. 14, 279 & 281.) The ALJ observed that Claimant had no "significant anatomical structural deformities" and that there was "no evidence of

9

ongoing nerve root compression which might be expected based on the degree of pain alleged." (R. 15.) The ALJ further noted that "given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by a treating doctor. Yet a review of the record in this case reveals no restrictions recommended by the treating doctor." (R. 16.) Additionally, the ALJ adopted a November 29, 2006 State Agency Physical Residual Functional Capacity Assessment, which was consistent with the ALJ's RFC determination. (R. 15, 239-247.)

The ALJ correctly analyzed Claimant's allegations of pain under the two-step process required by *Craig*, 76 F.3d at 594-95, but found them to not be fully credible (R. 15). Furthermore, there is substantial evidence in the record to support the ALJ's assessment. Claimant's primary care physician, Dr. Ben Siy-Hian, observed at a February 7, 2007 office visit that although Claimant had slight soreness and "some minimal tenderness on palpation of the back of the neck," Claimant's neck was supple, he moved briskly, he was ambulatory without any assistive device, he had no problems getting up and down from the exam table, and his range of motion of all extremities was normal. (R. 281.) On May 7, 2007, Claimant reported to Dr. Siy-Hian that he was feeling better despite continuing neck and shoulder pain. (R. 282.) On August 3, 2007, Claimant reported to Dr. Siy-Hian that he had been doing well, but continued to have *occasional* pain in the neck and shoulder; again, Dr. Siy-Hian noted that Claimant had a supple neck, a normal range of motion in his upper extremities, was ambulatory without assistance, and moved briskly. (R. 283.) On September 7, 2007, Claimant complained to Dr. Siy-Hian of "aches and pains," and the doctor recommended daily walking exercise and weight reduction through diet. (R. 284.) On February 8, 2008, Claimant saw Dr. Siy-Hian and again reported *occasional* neck pain, but that overall he was doing well. (R. 287.)

He reported no numbness or tingling sensation in his hands. *Id.* On November 24, 2008, Claimant reported that his condition was about the same, with *episodic* pain in his neck and shoulders. (R. 332). Dr. Siy-Hian recommended daily limbering exercises and advised Claimant not to stay in bed for long periods or to sleep more than six to seven hours daily. (R. 333.)

There is some evidence in the medical records that supports Claimant's complaints with regard to his neck and shoulders. Claimant routinely saw Dr. Kishbaugh at RPK Center for Rehab, Spine and Pain Management during the same period he was seeing Dr. Siy-Hian. Dr. Kishbaugh noted on April 25, 2007, that Claimant reported increased pain and stiffness in his neck and left shoulder and that examination showed decreased range of motion in the cervical spine (R. 277), and on July 3, 2007, that Claimant's neck range of motion was "markedly decreased." (R. 278.) On August 3, 2007, Claimant reported to Dr. Kishbaugh that he continued to have neck pain and stiffness, but was doing "fairly well" so long as he was taking medicine. (R. 279.) However, as noted above, during Claimant's visits to Dr. Siy-Hian in February, May, and August 2007, Claimant reported only slight soreness and minimal tenderness in his neck and occasional neck and shoulder pain, and the doctor's examinations consistently revealed that Claimant's neck was supple, he moved briskly, he was ambulatory without any assistive device, he had no problems getting up and down from the exam table, and his range of motion of all extremities was normal. (R. 281-283.) Furthermore, Dr. Kishbaugh noted on September 28, 2006, that Claimant appeared more comfortable than his stated pain level of 8/10. (R. 233.)

The fact that Claimant can point to other evidence in the record that supports his claimed impairments and their alleged severity does not diminish the ALJ's analysis or the fact that his opinion was supported by substantial evidence. When conflicting evidence is presented, the ALJ

retains the discretion to resolve such inconsistencies. *Hayes v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Accordingly, the ALJ properly assessed Claimant's RFC, and his finding that Claimant had the ability to perform a full range of medium work is supported by substantial evidence.

## B. Failure to Obtain Vocational Expert Testimony

Claimant contends that because he has significant nonexertional issues – chronic pain, tingling in his arms and numbness in his hands, medications that cause him blurred vision and dizziness, and a low IQ – the ALJ erred in relying on the Medical-Vocational Guidelines, otherwise known as the grids, and not obtaining the testimony of a vocational expert to evaluate the impact of those limitations on the occupational base.

"An ALJ may not rely exclusively on the grids where a nonexertional condition or impairment 'affects [a claimant's] residual functional capacity to perform the work of which he is exertionally capable.'" *Pickett v. Astrue*, No. 7:10-cv-190-D, 2011 WL 4443229, at *8 (E.D.N.C. Sept. 22, 2011) (Dever, C.J.) (quoting *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); citing 20 C.F.R. § 404.1569a(d)). A nonexertional limitation is one which affects a claimant's ability to meet the demands of jobs other than strength demands and can include pain. *Id.* "In such cases, an ALJ would be permitted to use the grids as a guide but, generally, must also employ expert vocational testimony to show that jobs exist in the national economy which the claimant can perform." *Id.* (citing *Aistrop v. Barnhart*, 36 Fed. App'x 145, 146–47 (4th Cir. 2002)). "On the other hand, if a claimant's nonexertional impairments do not prevent him from performing the full range of work at a given exertional level, the ALJ may rely solely on the grids to satisfy the burden of proof at step five." *Id.* (citing *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983)).

12

The alleged nonexertional impairments raised by Claimant were the same bases upon which Claimant challenged the ALJ's RFC determination. The ALJ considered Claimant's alleged nonexertional impairments in evaluating his RFC and found that they did not prevent him from performing a full range of medium work. (R. 13-16.) The undersigned has concluded that the ALJ properly assessed Claimant's RFC, including his complaints of pain, and that the ALJ's finding that Claimant had the ability to perform a full range of medium work was supported by substantial evidence. *See supra* section IV.A. Therefore, because the ALJ determined that the alleged nonexertional impairments do not prevent Claimant from performing the full range of medium work, it was not error for the ALJ to rely solely on the grids. *See Hoke v. Chater*, 74 F.3d 1231, 1996 WL 12856, at *3-4 (4th Cir. Jan. 16, 1996) (concluding that ALJ's reliance on grids was proper despite claimant's alleged nonexertional limitation of pain, where ALJ conducted proper analysis of pain allegation and cited substantial evidence to support his findings); *Pickett*, 2011 WL 4443229, at *8 (rejecting claimant's argument that alleged nonexertional impairments of postural limitations and pain precluded reliance on the grids).

## CONCLUSION

The undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings [DE-23] be **DENIED** and that the Commissioner's motion for judgment on the pleadings [DE-29] be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain

13

error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 18th day of January, 2012.

DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE